# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **NICKEY BROWN** | **CIVIL ACTION** |
| **VERSUS** | **NO: 09-3793-MVL-SS** |
| **OIL STATES SKAGIT SMATCO** | |

## REPORT AND RECOMMENDATION

For the reasons described below, it is recommended that the complaint of the plaintiff, Nickey Brown ("Brown"), be dismissed with prejudice.

## PROCEDURAL BACKGROUND

On June 16, 2009, Brown filed a complaint, pursuant to 42 U.S.C. §2000e (Title VII), for employment discrimination based on his race, African-American. Rec. doc. 1. He was granted leave to proceed *in forma pauperis*. Rec. doc. 3. Brown includes causes of action based on racial harassment and constructive discharge. He alleges that: (1) he was employed by the defendant, Oil States Skagit Smatco, LLC ("Oil States"), from March 12, 2008 to June 11, 2008; (2) he was subjected to racially derogatory remarks from a co-worker and racial graffiti; (3) his foreman was aware of the remarks and graffiti but did nothing to stop or remove them; (4) he was subjected to life threatening activity; (5) he complained to his foremen but they ignored him; and (6) because of this conduct and out of concern for his personal safety, he was compelled to quit. Rec. doc. 1.

The pretrial conference is set for September 30, 2010, and the trial is set for October 18, 2010. Rec. doc. 8.

On January 5, 2010, Brown was deposed in "Nickey Brown v. State Farm Mutual Automobile Insurance Company, et al," No. 156535, 32nd Judicial District Court, Parish of

Terrebonne, State of Louisiana, rec. doc. 16 (Exhibit B), involving an automobile accident which occurred in March, 2008. On May 26, 2010, he was deposed in this action. Rec. doc. 16 (Exhibit A). On July 23, 2010, Oil States filed a motion for sanctions based on Brown's perjured testimony. Rec. doc. 16.

## **PERJURED TESTIMONY**

In his opposition to the motion for sanctions, Brown admits that he "testified in this proceeding that he quit because the harassment was compelling" and that in the State Farm proceeding he testified that "he quit because of injuries suffered in that accident." Rec. doc. 25.

### **Testimony in State Farm action**

A. [A]fter the accident, I went back to work at Oil States. After I got hit, I went back to work at Oil States. They put me on light duty. I told them I was in an accident over there. They put me on light duty. I worked over there like on light duty for like two months or whatever.

\* \* \*

Q. You stayed at Oil States for, approximately, two months doing light-duty work?

A. Exactly, yes, sir.

Q. Then you stopped?

A. Uh-huh.

Q. Why?

A. Because my back was killing me. I stayed in pain all the time. I told the boss over there that and stuff like that.

Q. Did you stop working as a contract welder for Massey because of this accident, or did you stop working for Massey's for any other reason.

A.      Because of the accident.

* * *

Q.      You really went back to work for a couple of months, then you stopped going to work, is that right?

A.      I went back to work a couple of – yes, sir, I did, yeah, I was on light duty.

* * *

Q.      So Frank Toups was the Oil States employee, yeah, the Oil States employee who you reported to?

A.      Yes, sir.

* * *

Q.      Are Frank Toups, Dale Arcement and Craig Massey going to say you went on light duty after this accident but before you quit work?

A.      I can guarantee you they're going to say it.

Q.      Are those three guys going to say the reason you left work was because of this accident?

A.      Yes, sir. They knew my back was killing me and stuff like that. I was eating Tylenols like M&Ms and stuff trying to keep going and stuff because I had car notes to pay and stuff like that, rent to pay.

* * *

Q.      Explain to me what happened when work wanted you to go from light duty to full-time and who knew whether you could go back to full-time work?

A.      He knew I couldn't go back to full-time work, Frank Toups.

Q.      Frank Toups?

A. Uh-huh.

Q. Frank Toups was at Oil States?

A. Yes, sir.

Q. And Frank Toups is the one who knew you were on light duty who wanted you to go to full-time duty and who knew that you were physically not capable of returning to full-duty work?

A. Yes, sir.

Rec. doc. 16 (Exhibit B).

### Testimony in Title VII action

A. So here come June. I guess I woke up on the wrong side of the bed that day. All this nigger stuff started up again. Well, man, let me go. Next thing you know, I told Frank, because Trent went to some kind of meeting, something at the main yard where Jimmy and them at over there. Frank was in charge.

I told Frank - - they put me working with Frank. I said, "Well, Frank, I'm going, man. I had enough of this." Frank, "No, no, don't go nowhere, man. We need you out here. Don't go nowhere. Stay. No, don't go nowhere."

\* \* \*

Q. You ended with, you said, you spoke with Dale Arceneaux, and he sent you to another job?

A. No, ma'am. I spoke with Frank. Trent was at the other yard. I told Frank, "I quit, man. I got enough of this nigger stuff, man," stuff like that. He said, "No. Don't go nowhere. No. Don't go nowhere." I said, "Don't go nowhere?" "Man, we need you. You're a good worker. We are going to get rid of him," and stuff like that.

\* \* \*

Q. You quit on June 10, 2008; does that sound familiar?

A. That sounds familiar.

Q. Who did you talk to when you quit?

A. I talked to Frank.

Q. What did you tell Frank?

A. "Frank, man, this guy calling me all kind of niggers and spitting around me and stuff, and all this stuff, monkeys and stuff." Frank already knew about it and stuff like that. "I'm going to talk to him." "No. Don't go talk to him. I quit." "Man, why you going? Don't quit. We need you, man. You a good worker," and stuff like that. "No, man. I quit. I had enough." I said, "Oh, that's it. I might have a breakdown over here." I said, "That's enough. I quit."

\* \* \*

Q. Was there any other reason, other than what you've already told me, for why you quit?

A. I don't understand that question.

Q. Did any other reason play a role in why you decided to quit, other than what you've told me today.?

A. Oh, no, ma'am.

Rec. doc. 16 (Exhibit A)

## **ANALYSIS**

Brown contends that the sanction should be limited to the dismissal of count two of his complaint for constructive discharge. He argues that dismissal of both counts would be too harsh a remedy. Oil States urges that because of the unreconcilable and direct conflict between Brown's

sworn testimony in the two cases, it is clear that he knowingly committed perjury and his Title VII complaint should be dismissed in its entirety.

Brown has been caught lying under oath. He committed perjury in one or perhaps both of the depositions. Having been caught, he makes no attempt to offer the "truth." His acquiescence in the dismissal of the constructive discharge cause of action is nothing more than recognition of the consequences of the defendants' discovery of his conflicting testimony. The constructive discharge claim is without merit because Brown testified in the State Farm action that he quit because of disabling injuries. In McGarry v. University of Mississippi Medical Center, 355 Fed.Appx. 853 (5th Cir. 2009), the Fifth Circuit held that:

> To establish constructive discharge, a plaintiff must demonstrate that working conditions were so intolerable that a reasonable employee would feel compelled to resign. Constructive discharge requires a greater degree of harassment than that required by a hostile environment claim.

Id. at 858-59 (Citations and quotation marks omitted). With the discovery of his testimony in the State Farm case, there is no factual basis for a constructive discharge claim. The dismissal of the constructive discharge claim is not a sanction.

Brown urges that the dismissal of his cause of action for racial harassment is too severe. In Chambers v. NASCO, Inc., 501 U.S. 32, 111 S.Ct. 2123 (1991), the Supreme Court stated that:

> [I]nherent powers must be exercised with restraint and discretion. A primary aspect of that discretion is the ability to fashion an appropriate sanction for conduct which abuses the judicial process. [O]utright dismissal of a lawsuit . . . is a particularly severe sanction, yet is within the court's discretion. Consequently, the less severe sanction of an assessment of attorney's fees is undoubtedly within a court's inherent power as well.

Id. at 2132 - 2133 (Citations omitted). Brown is proceeding *in forma pauperis*. An assessment of attorneys' fees is meaningless because Brown cannot pay them.

6

In <u>Hull v. Municipality of San Juan</u>, 356 F.3d 98 (1st Cir. 2004), a businessman was in San Juan on November 8, 1999, when he allegedly tripped and fell on a sidewalk undergoing repairs. He filed suit and alleged serious injuries. During his deposition he failed to report that he sustained serious injuries in 1982, 1995 and 1996. The defendants conducted their own investigation and discovered this information. The plaintiff's explanation was that "in the heat of his deposition he had not remembered any of these incidents or claims." <u>Id</u>. at 100. The district court concluded that the plaintiff committed fraud and that dismissal was the proper sanction. On appeal, the plaintiff argued that it was unreasonable to use so extreme a remedy as dismissal, where lesser remedies were available. The court of appeals stated:

> [T]he sanction was obviously severe and lesser sanctions were available. . . . His deceits were substantial, deliberate, and went to the heart of the case. <u>And since not everyone will be caught, the penalty needs to be severe enough to deter</u>. In the choice of remedy, there was no abuse of discretion. . . .

<u>Id</u>. at 102 (emphasis added).

If Brown retains his claim for racial harassment, he suffers no penalty for perjuring himself in this action. As noted in <u>Hull</u>, not everyone like Brown will be caught. When it is discovered, the penalty needs to be severe enough to deter such conduct. Before the beginning of each deposition, Brown swore to tell the truth. This is not trivial. The proper administration of justice depends on people testifying truthfully under oath.

## **RECOMMENDATION**

IT IS RECOMMENDED that Oil States' motion for sanctions (Rec. doc. 16) be GRANTED and that Brown's complaint be dismissed with prejudice.

## OBJECTIONS

A party's failure to file written objections to the proposed findings, conclusions and recommendations in a magistrate judge's report and recommendation within fourteen (14) calendar days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (*en banc*).

New Orleans, Louisiana, this 26th day of August, 2010.

          **SALLY SHUSHAN**
          **United States Magistrate Judge**